# In the United States Court of Federal Claims

No. 18-1637C
(Filed: February 26, 2019)
**\*Opinion originally filed under seal on February 21, 2019**

| | |
|---|---|
| ADVANCED CONCEPTS ENTERPRISES, INC., | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Pre-Award Bid Protest; Subject Matter Jurisdiction; Standing; Qualified to Compete; Nontrivial Competitive Injury; Office of Hearing and Appeals; NAICS Code; Past Performance Evaluation.

*Robert John Wagman, Jr.*, Washington DC, for plaintiff, *Laura Prebeck Hang* and *Joshua M. Freda*, Washington DC, of counsel.

*Amanda L. Tantum,* Civil Division, United States Department of Justice, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Martin F. Hockey, Jr.*, Deputy Director, for defendant. *Brian Chapuran*, Associate General Counsel – Acquisition, Missile Defense Agency, Office of General Counsel, Washington DC, of counsel.

## OPINION

**FIRESTONE**, *Senior Judge*

Plaintiff, Advanced Concepts Enterprises, Inc. ("ACEs") brought this pre-award bid protest matter seeking to enjoin the United States Department of Defense, Missile Defense Agency ("MDA") from proceeding with the Request for Proposals No. HQ01470-18-R-0009 (the "Solicitation") on the grounds that (1) the United States Small Business Administration's Office of Hearings and Appeals ("OHA") decision to uphold

MDA's designation of the North American Industry Classification System ("NAICS")

code 541715[1] for the Solicitation was arbitrary, capricious, an abuse of discretion, and

contrary to law because NAICS code 541513[2] was more applicable to the Solicitation's

work, and (2) MDA's selection of past performance evaluation criteria in the Solicitation

contrary to law because it failed to provide for a comparative evaluation of past

performance among offerors and because it treated offerors with no relevant past

performance as "acceptable" and thus favorably.

The parties have filed cross-motions for judgment on the administrative record

pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims

("RCFC"). ACEs' Mot. for J. on the Admin. Rec. ("Pl.'s MJAR") (ECF No. 20); Def.'s

Cross-Mot. for J. on the Admin. Rec. ("Def.'s MJAR") (ECF No. 26). Also pending is

plaintiff's motion for preliminary and permanent injunctive relief. (ECF No. 13).

---

[1] NAICS code 541715 titled, "Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology" provides "This U.S. industry compromises establishments primarily engaged in conducting research and experimental development (except nanotechnology and biotechnology research and experimental development) in the physical, engineering, and life sciences, such as agriculture, electronics, environmental, biology, botany, computers, chemistry, food, fisheries, forests, geology, health, mathematics, medicine, oceanography, pharmacy, physics, veterinary and other allied subjects." NAICS Manual 2017 at 476. The NAICS code includes a special provision, Footnote 11(d), which states that "research and development for guided missiles and space vehicles includes 'evaluations and simulations, and other services requiring thorough knowledge of missiles and spacecraft." MDA relied on this provision in assigning NAICS code 541715 to this procurement.

[2] NAICS code 541513 titled "Computer Facilities Management Services" provides "This U.S. industry comprises establishments primarily engaged in providing on-site management and operation of clients' computer systems and/or data processing facilities. Establishments providing computer systems or data processing facilities support services are included in this industry." NAICS Manual 2017 at 470.

For the reasons discussed below, the court **GRANTS** the government's cross-motion for judgment on the administrative record and **DENIES** ACEs' motion for judgment on the administrative record together with its motion for injunctive relief.

## I.   FACTUAL BACKGROUND

On September 10, 2018, MDA issued the Solicitation seeking a contractor to support the "Advanced Research Center ("ARC") facility at Redstone Arsenal, located in Huntsville, Alabama. AR 3878. This procurement will result in the award of one five-year contract with three one-year and one half-year options. The estimated value is $308 million. AR 3743. The Solicitation has been set aside for Woman-Owned Small Businesses and the NAICS code 541715, Research and Development in the Physical, Engineering Life Sciences has a size standard of 1,250 employees. AR 1354, 3878.

### A.  Background

ARC is a contractor-owned General Service Administration ("GSA") leased Research, Development, Test and Evaluation ("RDT&E") facility designed and operated to support Ballistic Missile Defense System ("BMDS")[3] Hardware-in-the-Loop ("HWIL") Ground Test ("GT") and Flight Test ("FT") activities." AR 3349. ARC's Mission is to perform network/infrastructure design, to house and maintain the BMDS guided missiles and space tactical hardware and software, to maintain cybersecurity

---

[3] BMDS is an integrated, layered architecture that provides multiple opportunities to destroy missiles and their warheads before they can reach their targets. Specifically, it "comprises space-based sensors, ground- and sea-based radars, ground-and sea-based interceptor missiles, and a command and control system[.]" *MDA Faces Challenges in BMDS Concurrency and Integration Reporting*, 57 No. 19 Gov't Contracts ¶ 147 (May 13, 2015).

compliance, and to perform lab asset management to realistically emulate/simulate the complex weapon systems of the BMDS in support of BMDS Ground Testing and BMDS Flight Test Risk Reduction Activities. *Id.* Under this Solicitation, the systems will be expanded to include new sensors and tactical systems requiring ARC system design and development activities to integrate new programs into the BMDS. *Id.*

MDA is also transitioning to a new ground test concept that includes Continuous Integration and Continuous Agile Testing ("CI/CAT"). AR 3879. Continuous Integration ("CI") testing includes Continuous Development Integration ("CDI") and Continuous System Integration ("CSI") testing. As a result of CDI objectives, the contractor selected under the Solicitation will need to develop new processes and tools to respond to changes driven by CDI. This will include network design and expansion as well as installation and integration of Software/Hardware updates provided by elements as a result of CDI discoveries. AR 3880. Testing will be managed via a Resource Management Cell and this contract. *Id.*

MDA is also beginning the design and development of the new Combined Test Center ("CTC") facility to house the Missile Defense Data Center, the ARC, and related test assets. *Id.* Under this Solicitation, the selected contractor will participate in the system design activities to implement improvements that contribute to CI/CAT, asset management, and data flow across all MDA systems housed in the CTC. *Id.*

Because the Solicitation is designed to take on many improvements, developing the Solicitation involved a lengthy process which is summarized below.

### B.  Pre-Solicitation Market Research and Industry Day

In March and April 2016, MDA conducted market research related to the subject Solicitation. AR 19. MDA sent a Request for Information ("RFI") inviting contractors that could "assume all Research, Test and Evaluation, and Operation and Maintenance Functions" which included "in-progress tests, experiments, exercises, war-games and other customer programs as well as upgrade and modernization tasks involving facility, hardware, and software efforts" to submit a statement of capabilities. AR 1-2. MDA indicated that "capability statements will be separate from, and have no bearing on, submissions in response to any future Request for Proposal[.]" AR 3. The statement of capabilities was to include a description of the contractor's technical abilities, including network design capabilities. AR 12.

On January 12, 2017, MDA produced its first Market Research Report. AR 18-19. The January Report stated, regarding the selection of a NAICS code that "[o]ut of the 11 potential sources, 8 sources agreed 541712 [now 54715- the code at issue] was appropriate for this effort." *Id.* Two sources believed NAICS code 541513 was appropriate. *Id.*

On May 8, 2017, MDA invited prospective contractors to the ARC facility. AR 27. That same day, MDA requested industry input on its draft statement of proposed work ("PWS") and Technical Library content. AR 31. Thereafter, on June 30, 2017, MDA issued its second Market Research Report. AR 72. In the June Report, MDA announced the selection of NAICS code 541715. AR 74.

The third and final Market Research Report was issued on December 8, 2017. AR 162. The December Report focused on MDA's Organizational Conflict of Interest ("OCI") Policy. AR 163. The Report concluded that "absolute OCI restrictions should only be applied" in limited circumstances and "[a]ll other OCI concerns should be addressed under normal Agency OCI policy review procedures[.]" AR 165.

### C. Draft Solicitations, OCI Schedule, and Questions and Answers

On March 13, 2018, MDA issued the Draft Request for Proposals ("DRFP"). AR 205. Of significance here, the March RFP indicated that past performance "evaluation will result in a Performance Confidence Assessment" that included five rating categories: "Substantial Confidence," "Satisfactory Confidence," "Neutral Confidence," "Limited Confidence," and "No Confidence." AR 732, 734. The DRFP indicated that for offerors "without a record of relevant past performance or for whom information on past performance is not available . . . the offeror may not be evaluated favorably or unfavorably on past performance" and "shall be determined to have 'Neutral Confidence[.]'" AR 734. It further stated that "a record of 'Substantial' or 'Satisfactory' Confidence will be considered more advantageous to the Government than a record of 'Neutral Confidence.'" *Id.* Past performance was part of the tradeoff analysis. AR 728.

On April 4, 2018, MDA released another DRFP. AR 745-48. The April DRFP indicated that "[i]f an offeror believes that the requirements in these instructions contain an error, omission, ambiguity, or are otherwise unsound, the offeror shall immediately notify the PCO in writing with supporting rationale no later than five (5) days after the release of this solicitation." AR 1192. The April DRFP further indicated that regarding

6

past performance, "the Government will conduct an assessment of the offerors', Team

Members', and Major Subcontractors' Past Performance." AR 1289. It also stated that

past performance would now be evaluated either acceptable or unacceptable where

acceptable meant that "the Government has a reasonable expectation that the offeror will

successfully perform the required effort, or the offeror's performance record is

unknown." AR 1286. The DRFP stated that offerors with no relevant past performance

will "be determined to have an unknown past performance" and that an "unknown"

determination is considered "acceptable." *Id.*

On May 21, 2018, the Independent Government Estimate ("IGE") and Technical

teams evaluated the performance work statement in the DRFP. AR 1351. Part of the

evaluation included considering which NAICS codes should apply to various Contract

Line Item Numbers ("CLINS"). *Id.* Eventually, the IGE and Technical teams concluded

that NAICS code 541715 was appropriate. *Id.* The evaluators considered the following

NAICS codes: 541513 for "Computer Facilities Management," 541330 for "Engineering

Services Military and Aerospace Equipment and Military Weapons," 518210 for "Data

Processing, Hosting, and related Services," and 519190 for "All Other Information

Services." AR 1355. The evaluators concluded that NAICS code 541715 was appropriate

because 41% of the work was under CLIN 006 which called for Network Design and fit

under NAICS code 541715. AR 1351, 1356. The IGE team concluded that NAICS code

541513 accounted for 17% of the work. AR 1356.

On July 10, 2018, MDA posted its second round of questions and answers. AR

1367. Although ACEs submitted a question regarding the selection of NAICS code

7

541715, MDA did not answer the question. AR 1369. As the below-quoted text of the

question makes clear, ACEs did not ask for an alternative NAICS code designation:

> Although the Agency may perform RDT&E [research and development, testing and evaluation] activities in the ARC facility, those activities appear to be performed on other contract vehicles. The work to be performed on the ARC contract, as described in the Agency's draft PWS, is clearly to operate and maintain an environment to support testing, not to perform the actual test or analysis activities. The NAICS code for this procurement currently is listed as 541715, which applies to "Research and Development in the Physical, Engineering and Life Sciences (except Nanotechnology and Biotechnology)." The currently selected NAICS code for the procurement does not appear to be appropriate for this procurement for several reasons. Please describe the Agency's rational for NAICs selection as it relates to each of the following:
>
> -Reference: Draft RFP Sec. K. According to the PWS, the principal purpose of the contract is not to conduct research and development but to "support the management of the Special Purpose Processing Node, Unclassified Networks, and other Government Furnished Equipment compromising the ARC, providing the infrastructure necessary to support Hardware-in-the-Loop Ground Test and tenant/stakeholder activities as part of the SPPN."
>
> -Reference: Draft RFP Sec. K. GAO decided recently in ASM Research, B-412187 (Jan. 7, 2016) a firm maintaining a test environment is precluded from conducting testing in that environment because it presents an organizational conflict of interest. Because the contractor will be precluded from performing any research and development in the ARC, the NAICS code designated on the RFP is inapplicable.
>
> -Reference: Draft RFP Sec. K. The NAICS code for this procurement currently is listed as 541715, which applies to "Research and [sic]

*Id.* While MDA listed the question, MDA never responded to ACEs' question regarding

the selection of NAICS code 541715.

### D. Final Solicitation and Amendments

On September 10, 2018, MDA posted the Final Solicitation. AR 1539. Four days

later, MDA posted the first amendment to the Solicitation. AR 2103. The final

Solicitation was posted on October 17, 2018. AR 3265. The deadline for submissions was October 25, 2018 at 16:00 central time, and offerors were required to "confirm their delivery date and time with the Contracting Officer . . . by 16:00 central time, October 22, 2018." AR 3221.

For purposes of this bid protest, the relevant information in the Solicitation pertaining to the NAICS code selected and the past performance evaluation criteria are described separately.

### 1. Described Work in the PWS

The Solicitation includes a PWS that showed what type of work would be required and under which CLIN the work was categorized. AR 3250-3371. In total, there are six CLIN categories. The court draws from OHA's thorough descriptions of these CLIN categories.

CLIN 001 is titled Contract and ARC Management. Under CLIN 001, the contractor shall manage and maintain cost, schedule, performance, risk, subcontracts, vendors, test assets and associated maintenance agreements, infrastructure, and data to sustain ARC operations. AR 3880 (citing PWS § 3.1(a)). The contractor shall maintain a Program Management Plan that details the complete structure of contractor support, shall participate in facility expansion or modification planning meetings to ensure coordination with ARC long-range planning, testing activities, security requirements, and MDA guidance. *Id.* (PWS § 3.1(a), (e)). The contractor shall monitor all ARC networks for proper operation, throughput, quality of service, security compliance, and that cybersecurity policies and guidelines are followed in all aspects of network operations

and system administration. *Id.* (PWS § 3.2). The contractor shall develop a maintenance plan for ARC test assets and obtain/maintain software licensing, and shall evaluate, test, and integrate all software into the ARC networks. *Id.* (PWS § 3.3(a), (c)). The contractor shall manage and operate a shipping and receiving department/property office to inspect and verify deliveries, maintain property control records, and perform a quarterly inventory audit. *Id.* (citing PWS § 3.3(e)). CLIN 001 accounts for 15 percent of the estimated work. AR 1351.

CLIN 002 is titled Network Management. Under CLIN 002, the contractor shall maintain the schedule of all ARC activities/projects and a fully resource loaded Integrated Master Schedule ("IMS"), conduct weekly IMS review meetings, facilitate asset allocation, de-confliction, configuration management and test event certification, and provide utilization and integration metrics. AR 3880-81 (citing PWS § 4.1). Also, the contractor shall integrate ARC test asset schedules with the ARC Master Schedule, and resolve conflicts between test asset requests, infrastructure needs, and facility maintenance. AR 3881 (citing PWS § 4.1). The contractor shall maintain ARC configuration files off-site, develop and execute documentation and procedures for IT Contingency and Disaster Recovery ("DR"), and conduct quarterly DR tests. *Id.* (citing PWS § 4.2).

The contractor shall establish and maintain a centralized helpdesk and log of all incidents and requests; establish incident management procedures for all facility, software, hardware, and communications problems; and provide support services for briefings and demonstrations. *Id.* (citing PWS § 4.3). Also, the contractor shall develop,

implement, and maintain a Configuration Management Plan, maintain test asset data, and operate software systems that record, reserve, and schedule ARC test assets. *Id.* (citing PWS § 4.4). Regarding Special Purpose Processing Node ("SPPN") Management, the contractor shall plan, implement, and operate the ARC and provide utilization metrics on all ARC test assets. *Id.* (citing PWS § 4.5(a), (e)). The contractor shall develop and implement solutions to profile traffic flow to predict problems. *Id.* (citing PWS § 4.5(f)). Also, the contractor shall evaluate new hardware and software technologies for ARC networks, provide strategic planning, and recommend approaches in designing system and network configurations, software/script development, power usage, and Reliability, Availability and Maintainability engineering support in the development of new ARC systems. *Id.* (citing PWS § 4.5(g)).

The contractor shall provide network analysis and communications engineering support for telecommunications and network systems, including the ARC side of remote nodes and ARC based customers. *Id.* (citing PWS § 4.5(h)). The contractor shall support Communications Security ("COMSEC") maintenance and engineering activities for BMDS test and evaluation networks. *Id.* (citing PWS § 4.5(i)). The contractor shall collaborate to plan, document, and execute network communication interfaces between ARC network infrastructure and other network infrastructures. *Id.* (citing PWS § 4.5(j)).

The contractor shall manage IT infrastructure and networks comprised of commercial and tactical systems to include asset allocation and de-confliction, configuration management, and Integrated Master Schedule development, management, and execution. *Id.* (citing PWS § 4.5(k)). The contractor shall manage network bandwidth

11

allocation, and metrics monitoring utilization and downtime for all Laboratories, HWIL, and formal ground test activities. *Id.* (citing PWS § 4.5(l)). The contractor shall develop network diagrams for all ARC networks / enclaves, and perform OEM-recommended preventive maintenance. *Id.* (citing PWS § 4.5(m), (n)). Also, the contractor shall develop a Technology Refresh plan for the IT Infrastructure, taking into account synergies derived from the CI/CAT, Combined Test Center design, and BMDS expansion activities. *Id.* (citing PWS § 4.6). CLIN 002 accounts for 17% of the assigned work. AR 1351.

CLIN 003 is titled Cybersecurity. The ARC handles Restricted Data and Critical Nuclear Weapon Design Information on a daily basis when executing the requirements of this contract. AR 3881. The contractor shall control access to information systems within the ARC, and shall create, maintain and manage all BMDS test and evaluation assets and infrastructure user accounts. *Id.* (citing PWS § 5.0). The contractor shall implement a cybersecurity program for all classified and unclassified networks and will support a broad-based capability of general cybersecurity services protection for the MDA ARC test labs and assets such as hardware/software products, computer systems and subsystems, and network and communications resources. AR 3881-82. (citing PWS § 5.01(a), (b)). Also, the contractor shall continually monitor all external/ internal traffic and report monthly the health, status, and utilization of the network(s). AR 3882. (citing PWS § 5.0(c)).

The contractor shall monitor and comply with all instructions for Security Technical Implementation Guides (STIGs). *Id.* (citing PWS § 5.1(a)). In addition, the

contractor shall respond promptly and comply with MDA Cyber Tasking Orders (CTOs). *Id.* (citing PWS § 5.1(a)). Weekly, the contractor shall perform a system wide analysis on all IT systems and infrastructure to identify vulnerabilities and implement risk mitigation recommendations. *Id.* (citing PWS § 5.1(b)). The Contractor shall safeguard and protect Controlled Unclassified Information ("CUI"); develop and institute a training program for ARC Contractor personnel, and monitor training and certification status of all cybersecurity personnel. *Id.* (citing PWS § 5.1(e)).

Further, the contractor shall develop and maintain security accreditation packages for ARC Network and Infrastructure hardware, software and networks; support activities required to maintain MDA system/enclave cybersecurity approvals; and also support BMDS Element Accreditation activities. *Id.* (citing PWS § 5.1(f)). Also, the contractor shall develop Risk Management Framework ("RMF") packages and artifacts for classified and unclassified networks, and shall develop, update, and execute the Concept of Operations to include Cybersecurity, Information Assurance, and RMF. *Id.* (citing PWS § 5.1(h), (i)).

Under Security Management, the contractor shall continually demonstrate that it is capable of protecting critical unclassified and classified information, and provide personnel to support Government security personnel. *Id.* (citing PWS § 5.2(a)). The contractor shall assist in the development and implementation of all day-to-day security procedures including information security, physical security, COMSEC, and Operations Security (OPSEC). *Id.* (citing PWS § 5.2(b)).

The contractor shall closely monitor changes to STIGs covering security requirements, identify requirements not being met, and assist the government in developing new processes and procedures as a result of updated or changed Accreditation Authority guidance. *Id.* (citing PWS § 5.2(c)). Also, the contractor shall implement modified processes and procedures to protect BMDS data and information at all times. *Id.* (citing PWS § 5.2(c)).

The contractor shall assist the Government to develop and incorporate OPSEC guidance in day-to-day activities to mitigate security and program risks associated with the collection and analysis of MDA information by adversaries, and actions against the MDA mission and its personnel. *Id.* (citing PWS § 5.2(e)). The contractor shall implement MDA policies and procedure to maintain compliance with all applicable COMSEC guidance. *Id.* (citing PWS § 5.2(f)). The contractor shall design or procure, incorporate and operate security resources required to support the security requirements of ARC's programs, projects and assets. *Id.* (citing PWS § 5.2(g)).

The contractor shall implement practices to restrict unnecessary sharing and/or flow of CUI down the entire supply chain based on need-to-know. *Id.* (citing PWS § 5.3(b)). The contractor shall develop an Information Management and Control Plan ("IMCP") that shall identify practices to restrict the unnecessary sharing and/or flow of CUI, address procedures for reporting a cyber-incident, and document the process by which System Security Plans and Plan of Action and Milestones are developed and maintained to protect CUI within the contractor's/subcontractor's unclassified IT

14

systems. AR 3882-83. (citing PWS § 5.3(c)). CLIN 3 accounts for 14% of the work. AR 1351.

CLIN 004 is titled Test Support. The contractor shall facilitate test asset hardware and software upgrades, design and implementation. AR 3883. (citing PWS § 6.1(a)). The contractor shall develop and implement a configuration control process by which lockdown is implemented prior to a test event and rescinded after completion. *Id.* (citing PWS § 6.1(b)). The contractor shall provide infrastructure, network design and configuration design to meet test event and training requirements and issue resolution in support of Test, Integration Management, Test Execution Center (TEC) management, and Advance Training Operational Center training exercises. *Id.* (citing PWS § 6.1(c)). The contractor shall perform technical analysis to support design, development, integration, execution, and analysis of experiments, test, and exercises, and demonstrations of distributive software technology, real-time algorithms, and information assurance. *Id.* (citing PWS § 6.1(d)). The contractor shall develop an automated system for test set-up and related configuration control. *Id.* (citing PWS § 6.2). The contractor shall support the test event certification process and ensure formal certification is received prior to test execution. The contractor shall develop Certification Data Packages of ARC assets to support formal ground tests. *Id.* (citing PWS § 6.3).

The contractor shall support BMDS Integration and Development testing in the TECs and ARC test assets; this includes risk reduction, software checkout, keep alive runs, and other non-IMTP events. *Id.* (citing PWS § 6.4(a)). The contractor shall provide video projection engineering and support for test execution and operator control rooms

requiring situational awareness and visualization during IMTP testing or BMDS test and

execution element checkouts. *Id.* (citing PWS § 6.4(a)). The contractor shall configure

Test Support System equipment to allow routing of situational awareness screens to the

TECs. *Id.* (citing PWS § 6.4(b)). The contractor shall provide personnel to integrate

Ground Based Midcourse (GM) defense and Sensor (SN) assets, act as test "conductor",

and provide statistics on integration runs for GM and SN assets. *Id.* (citing PWS

§ 6.4(c)).

The contractor shall collect data for MDA test events, provide storage, and

coordinate data collection. *Id.* (citing PWS § 6.5). The contractor shall design, develop

and execute network scripts or other software for data collection, storage, and eventual

dissemination of test data to the Missile Defense Data Center. *Id.* (citing PWS § 6.5).

CLIN 004 accounts for 12% of the work. AR 1351.

CLIN 005 is titled Task Instructions – Real World Events. Performance under this

Task Instruction (TI) Contract CLIN will be in support of activities for "real world"

events such as analysis assigned to elements from external agencies to include Warfighter

Request for Analysis/Requests for Real World Events/Urgent Unknowns. The contractor

shall support any real world event identified by the Government and perform by

reprioritizing work and adjusting work schedules to ensure mission success. AR 3883

(citing PWS § 7.0).

CLIN 006 is titled Network Design. Performance under this CLIN includes

research and development engineering activities. AR 3884. (citing PWS § 8.0). The

contractor shall develop network scripts and new software tools. Software development

16

includes designing, developing and implementing solutions to support CI/CAT through Rapid Reconfiguration of System Test Architectures; automated health and status tools compatible with the HWIL GT environment; and Independent Verification & Validation (IV&V) processes, systems, software or hardware to support the acceptance and integration of new BMDS elements into the ARC infrastructure. *Id.* (citing PWS § 8.1(a)). New elements could include additional HWIL assets, or new BMDS representation/HWIL assets such as new sensors, interceptors, and systems such as Patriot and Integrated Air and Missile Defense (IAMD). *Id.* (citing PWS § 8.1(a)).

The contractor shall design, develop and prepare an Analysis of Alternatives ("AoA") for Hardware and Software solutions for rapid reconfiguration to support improvements in system reconfiguration and Configuration Management necessary to support Agile Testing (Continuous Integration/Continuous Agile Testing). *Id.* (citing PWS § 8.2(a)). The contractor shall re-design network architecture to support increased data transmission for CI/CAT. *Id.* (citing PWS § 8.2(b)). The contractor shall design, develop and prepare an AoA to implement automated Health and Status and Configuration Control to tactical HWIL systems. *Id.* (citing PWS § 8.3). The contractor shall design, develop and prepare an IV&V suite of tools to support integration and acceptance of new BMDS assets delivered to the ARC. *Id.* (citing PWS § 8.4).

Under Network Design, the contractor shall design and implement a network engineering, management, and monitoring capability that encompasses all unclassified and classified networks in the ARC. *Id.* (citing PWS § 8.5(a)). The contractor shall design, develop and implement network designs in support of HWIL, test lab emulation,

and cybersecurity. *Id.* (citing PWS § 8.5(b)). Network Design activities also include expansion and/or changes to existing network designs to: incorporate hardware and software solutions to integrate additional BMDS systems into the ARC infrastructure; incorporate new BMDS systems such as LRDR and HDR into BMDS representation; update the BMDS Independent and Development Lab ("BID Lab") Architecture for inclusion of CI/CAT-related CDI; incorporate into the ARC architecture new BMDS design solutions to support Hypersonic Glide Vehicle, UAV platform, and Advance Tactical Aircraft; design and develop system architecture re-designs to support the Combined Test Center (CTC); and design and update the HWIL architecture to include existing BMDS assets such as IAMD and Patriot. *Id.* (citing PWS § 8.5(b)). As discussed above, CLIN 006 accounts for 41% of the contract work. AR 3884.

## 2.  Past Performance Evaluation

The past performance evaluation criteria in the third amended Solicitation are the same as those found in the April DRFP. The Solicitation provides that MDA will evaluate past performance for recency, relevancy, and quality. AR 3259-60. The relevancy assessment will measure "the extent of similarity between the service/support effort, complexity, dollar value, contract type, and subcontract/teaming" and the "scope and magnitude of effort and complexities this solicitation requires." AR 3260. After this review, the offeror's past performance will be rated either "acceptable" or "unacceptable." AR 3256, 3259. Acceptable is defined as "[b]ased on the offeror's performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is

unknown." AR 3256. Unacceptable is defined as "[b]ased on the offeror's performance record, the Government has no reasonable expectation that the offeror will successfully perform the required effort." *Id.* Additionally, the Solicitation included a note that said "[i]n the case of an offeror without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the offeror may not be evaluated favorably or unfavorably on past performance (see FAR 15.305 (a)(2)(iv)[.]" *Id.* The Solicitation states that offerors with "unknown past performance," in the context of Acceptability / Unacceptability, "shall be considered 'Acceptable.'" *Id.*

Past performance was Factor 3 in the final Solicitation's list of evaluation factors. AR 3255. Furthermore, the final Solicitation stated, as it had in the April DRFP, that the "selection decision will document tradeoffs between Factors 4, 5, and 6 in the competitive range [for those offerors receiving] receiving an acceptable rating for Factors 1-3." *Id.* Thus, past performance was not a tradeoff criteria.

### E. ACEs' Protest Before OHA

ACEs filed a protest on September 11, 2018 before the SBA's Office of Hearings and Appeals (OHA) contesting MDA's selection of NAICS code 541715. AR 3828. On September 12, 2018, OHA issued an order in response to ACEs' protest. AR 3838.[4] In that order, OHA asked the Contracting Officer ("CO") to "[n]otify OHA of any

---

[4] The facts surrounding OHA's procedure are relevant here because ACEs alleges that this court should set OHA's decision aside and remand the case back to OHA because OHA violated its own procedures by considering an amendment to the Solicitation made after the close of record date.

additional amendments to the solicitation, any contract award, or any other litigation affecting this procurement, while this appeal is pending." AR 3839. OHA closed the record on September 27, 2018, AR 3840, and thereafter on October 28, 2018, issued its decision upholding the MDA's selection of NAICS code 541715. AR 3847. OHA relied on a version of the Solicitation amended on October 16, 2018 in its analysis. AR 3879. The changes to the Solicitation were:

1.  "Urgent, Non-Test, Network down reporting: 4 hours" was removed from Section 4.3.1(e)(2).

2.  Section 5.2, subsections (a)-(d), of the original PWS were replaced with Section 5.2, subsections (a)-(g), in the revised (Rev 01) PWS.

3.  Section 5.2, subsections (e), (f), and (g), of the original PWS were moved to Section 5.0, subsections (a), (b), and (c), of the Rev 01 PWS.

4.  In Section 5.3(d)(6), "1000 business days" was changed to "45 business days."

5.  In Section 5.3(f), the citation "sections 3a-e" was changed to "sections 5.3(c)1-5."

6.  In Sections 9 and 11, a parenthesis was added in the header to reflect the CLIN numbers.

7.  Section 12.0(c) and the "Staffing Requirements" table were updated to number the key personnel for clarity.

The October 16, 2018 changed none of the substance in Section I.D.1 above. Out of the above changes, OHA only relied on Section five where subsections were moved around. The following is an outline of the relevant portions of OHA's decision.

### 1.  Description of ACEs' Arguments

OHA explained that ACEs "contends that NAICS code 541715 is inappropriate for this RFP because this is not a research and development procurement" and that ACEs "urges OHA to conclude NAICS code 541513, Computer Facilities Management Services, with a $27.5 million annual receipts size standard, is the appropriate NAICS code" for the Solicitation. AR 3885. OHA further stated that ACEs argued "that contracts to support or assist a research organization cannot be automatically deemed to be research and development procurements." *Id.* ACEs cited several previous OHA decisions to show that OHA rejects using NAICS code 541715 for contracts that support for agency research and development. *Id.* (citing *Size Appeal of Professional Project Services, Inc.*, SBA No. SIZ-5411 (2012); *NAICS Appeal of Bevilacqua Research Corp.*, SBA No. NAICS-5243 (2011); *NAICS Appeal of Information Ventures, Inc.*, SBA No. NAICS-4953 (2008)).

In particular, ACEs argued that CLIN 006, which "is the single largest CLIN, making up 41% of the Full Time Equivalents (FTE) for the instant procurement," includes required tasks which "are not research and development, but design and implementation of hardware and software solutions that support MDA." *Id.* Therefore, OHA explained, ACEs argued that because both research and development were required for MDA to assign NAICS code 541715, MDA's decision was clearly erroneous. *Id.* (citing *NAICS Appeal of Dayton T. Brown, Inc.*, SBA No. NAICS-5164, 2010 WL 9012920 (2010)).

## 2.  Relevant Definitions

OHA laid out the definitions of NAICS Code 541715, 541513, and the general definition of research from the NAICS Manual. OHA stated that NAICS code 541715 covers: "establishments primarily engaged in conducting research and experimental development (except nanotechnology and biotechnology research and experimental development) in the physical, engineering, and life sciences, such as agriculture, electronics, environmental, biology, botany, computers, chemistry, food, fisheries, forests, geology, health, mathematics, medicine, oceanography, pharmacy, physics, veterinary and other allied subjects." AR 3888-89. OHA explained that research is defined as "original investigation undertaken on a systematic basis to gain new knowledge", and "experimental development" as "the application of research findings or other scientific knowledge for the creation of new or significantly improved products or processes[.]" AR 3889. OHA explained that NAICS code 541513 includes "establishments primarily engaged in providing on-site management and operation of clients' computer systems and/or data processing facilities. Establishments providing computer systems or data processing facilities support services are included in this industry." *Id.*

Additionally, OHA considered the footnotes to NAICS code 541715. OHA explained that Footnote 11(a) for NAICS code 541715 states that research and development "means laboratory or other physical research and development. It does not include economic, educational, engineering, operations, systems, or other nonphysical research; or computer programming, data processing, commercial and/or medical laboratory testing." *Id.* And OHA then said that Footnote 11(d) states that research and

development "for guided missiles and space vehicles includes evaluations and simulation, and other services requiring thorough knowledge of complete missiles and spacecraft." *Id.*

### 3.  OHA's Analysis

OHA began by acknowledging that "OHA has long held that procurements classified under a research and development NAICS code 'must be for research and development, and thus must look to creating new processes or products.'" AR 3890 (citing *NAICS Appeal of Dayton T. Brown, Inc.*, SBA No. NAICS-5164, 2010 WL 9012920, at *5 (Nov. 8, 2010)). OHA then went on to explain that a special rule applies with regard to guided missiles and space vehicles, stating that in "Footnote 11(d), the regulation provides that research and development for guided missiles and space vehicles includes 'evaluations and simulations, and other services requiring thorough knowledge of missiles and spacecraft.'" *Id.* Based on this provision, OHA explained that a research and development procurement involving missiles and spacecraft "is therefore not as strict as it is in other disciplines." *Id.* (referencing *NAICS Appeal of Millennium Eng'g and Integration Co.*, SBA No. NAICS-5309, 2011 WL 6183624, at *11-12 (Dec. 12, 2011)). OHA concluded that "an RFP which requires evaluations and simulations involving missiles and similar devices, as well as a thorough knowledge of these technologies, may be designated under the NAICS 541715, under the Guided Missiles and Space Vehicles

exception." *Id.* (citing *NAICS Appeal of DCS Corp.*, SBA No. NAICS-5703, 2016 WL 270949, at *4 (Jan. 6, 2016)).

Tested by these standards, OHA explained that "this RFP explicitly requires services involving evaluations and simulation of missiles, requiring a thorough knowledge of missiles, and thus fits into the description of the NAICS exception in Footnote 11(d)." AR 3891. In this connection, OHA stated that "BMDS is an extraordinarily complicated and sophisticated undertaking, compared to 'hitting a bullet with a bullet.' The lab assets include the hardware and software necessary for guided missiles and space vehicles. This contract will expand these systems to include new sensors and tactical systems ARC designs, and development to integrate new programs into BMDS." AR 3890. OHA further stated that the "contractor will be servicing the necessary modeling and simulation equipment." AR 3890-91. OHA concluded that because a thorough knowledge of BMDS is required to perform this contract, the Solicitation "explicitly requires services involving evaluations and simulation of missiles, requiring a thorough knowledge of missiles, and thus fits into the description of the NAICS exception in Footnote 11(d)." AR 3891.

Then, OHA discussed the work OHA relied on to conclude that the Solicitation required evaluations, simulations, and other services requiring a thorough knowledge of missiles. First, and foremost, OHA concluded that CLIN 006 on network design, called for research and development. AR 3891. OHA stated that the "contractor is required to develop new tools and processes to respond to changes required by the results of testing" and that the "contractor will participate in the system design activities to implement

improvements to CI/CAT, asset management and all of MDA's data flow." *Id.* OHA

specifically concluded that under CLIN 006, the "contractor's work will include original

investigation, or research, to obtain necessary knowledge to develop the AoA for

hardware and software solutions necessary to support the CI/CAT." *Id.* OHA stated that

CLIN 006 "represents the largest portion of this contract" because it represents 41% of

the work and "includes research and development of the software which will be an

integral part of the essential simulations to support the BMDS." *Id.* Therefore, OHA

concluded, "the CO was correct in characterizing this CLIN as research and

development." *Id.*

     OHA further noted that CLIN 004 expressly calls for research and development.

AR 3891. OHA stated that under CLIN 004 the contractor is required "to collect data for

MDA test events" and "[t]his constitutes original investigation, or research, and is

necessary for the support of MDA." *Id.* With regard to Footnote 11(d), OHA stated that

"[t]he contractor must further use this research to develop software and systems to

support the tests and simulations for BMDS." *Id.*

     Finally, OHA relied on CLIN 003 regarding cybersecurity, stating that CLIN 003,

"supports a research and development designation." *Id.* OHA explained that CLIN 003

requires the contractor "to implement a cybersecurity program for all the networks" and

"develop new processes and procedures" to address the cybersecurity requirements. *Id.*

OHA further stated that "once investigated and created, new cyber tools, standards,

processes and method must be continually refined, tested and improved." *Id.* OHA cited a

previous OHA decision where OHA "found that a procurement for cyber warfighting

capabilities was properly designated as a Research and Development procurement, because the new cyber tools must be created in the first instance, even if the procurement did not specifically call for laboratory research." *Id.* (citing *NAICS Appeal of Tech. Sec. Assoc., Inc.*, SBA No. NAICS-5950, 2018 WL 6113389, at *12 (Aug. 13. 2018)). Overall, OHA concluded that "this RFP requires the contractor to engage in original investigation, or research to obtain the necessary knowledge to develop the software and hardware to support the testing and simulation of the BMDS program, and it requires the contractor to have a thorough knowledge of the program to perform the procurement." AR 3891.

Having concluded that ACEs had not established that NAICS code 541715 was clearly erroneous for this RFP, OHA stated that "it is unnecessary to consider the NAICS code [ACEs] advocates." AR 3892. OHA explained that "OHA will not assign a different NAICS code to a procurement unless the CO's NAICS code classification is shown to be clearly erroneous." *Id.* (citing *NAICS Appeal of Tech. Sec. Assoc., Inc.* SBA No. NAICS-5950, at *14 (2018)).

## II.   PROCEDURAL HISTORY

On October 24, 2018, the day before proposals were due on the Solicitation, ACEs submitted a complaint in this court requesting a temporary restraining order, preliminary injunction, permanent injunction, and declaratory judgment with regard to both the Solicitation's designation of NAICS code 541715 and the Solicitation's evaluation criteria for past performance. Compl. ¶ 1 (ECF No. 1). ACEs also filed motions for a temporary restraining order and permanent injunction that same day. (ECF Nos. 2,3).

Later that day, OHA released its decision affirming MDA's designation of NAICS code 541715 for this Solicitation. AR 3878. ACEs did not submit a proposal.

The following day, October 25, 2018, this court denied ACEs' motion for a temporary restraining order. (ECF No. 9). The court reasoned that "because proposals have to be submitted in person on October 25, 2018, the court finds that the request for a TRO filed one day before proposals were due is untimely and further that the issuance of a TRO would greatly prejudice both the government and potential offerors that have submitted or have committed to submit proposals on the due date set forth in the solicitation." *Id.*

On October 31, 2018, ACEs submitted an amended complaint challenging OHA's decision. Amend. Compl. (ECF No. 12). That same day, ACEs filed a renewed motion for a preliminary and permanent injunction. Pl.'s Renewed Mot. (ECF No. 13). The government filed the administrative record on November 5, 2018. (ECF No. 17). On November 19, 2018, ACEs filed its motion for judgment on the administrative record and on November 19, 2018, the government filed its cross-motion for judgment on the administrative record. (ECF Nos. 20, 26). Briefing was completed on December 14, 2018. Oral argument was February 5, 2019. (ECF No. 36).

## III.   SUBJECT MATTER JURISDICTION AND STANDING

Before turning to the merits of ACEs' complaint, the court must first "'satisfy itself that it has jurisdiction to hear and decide a case.'" *Hardie v. United States*, 367 F.3d 1288, 1290 (Fed. Cir. 2004) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)); *see Remote Diagnostic Techs., LLC v. United States*, 133 Fed. Cl.

27

198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998))

("Jurisdiction is a threshold matter that must be resolved before the Court can take action

on the merits.")). The court has jurisdiction under 28 U.S.C. § 1491(b)(1) to "render

judgment on an action by an interested party objecting to . . . any alleged violation of

statute or regulation in connection with a procurement or proposed procurement."

Because standing is a jurisdictional question, the court must also "determine

whether [the] plaintiff has standing before it can proceed to a decision on the merits."

*Remote Diagnostic Techs., LLC*, 133 Fed. Cl. at 202. The protestor, as the party invoking

this court's jurisdiction, "bears the burden of establishing [standing], and must ultimately

do so by a preponderance of the evidence." *RMGS, Inc. v. United States*, 140 Fed. Cl.

728, 737 (2018) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748

(Fed. Cir. 1988) and *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). "[A]

plaintiff must demonstrate standing for each claim he seeks to press[.]" *Davis v. Federal

Election Com'n*, 554 U.S. 724, 734 (2008) (quoting *Daimler Chrysler Corp. v. Cuno*, 547

U.S. 332, 352 (2006)).

Importantly, standing under Section 1491(b)(1) "imposes more stringent standing

requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359

(Fed. Cir. 2009) (citation omitted). "To demonstrate standing under 28 U.S.C.

§ 1491(b)(1), a plaintiff must show that it is an 'interested party' who suffered prejudice

from a significant procurement error." *Thomas-Sea Marine Constructors, LLC v. United

States*, 141 Fed. Cl. 185, 209 (2018) (citing *CliniComp Int'l, Inc. v. United States*, 904

F.3d 1353, 1358 (Fed. Cir. 2018)). In order to be an interested party, the protestor must

first show that it was an "actual or prospective bidder." *Digitalis Educ. Sols, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).[5] Second, the protestor must show that it has a "direct economic interest" in the contract. *Id.* Where a "prospective bidder challenges the terms of the solicitation itself . . . the protestor can establish standing by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'" *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting *Weeks Marine, Inc.*, 575 F.3d at 1361-62). The Federal Circuit has recently held that "to suffer a non-trivial *competitive injury*, [the protestor] must at least be qualified to compete for the contract it seeks." *CliniComp, Int'l, Inc. v. United States*, 904 F.3d 1353, 1360 (Fed. Cir. 2018).[6]

Here, the government argues in its cross-motion for judgment on the administrative record that this protest must be dismissed because ACEs has not shown

---

[5] Where the protestor has failed to submit a proposal by the deadline, the protestor can still become a "prospective bidder" if the protestor submits a timely protest and is "*expecting* to submit an offer prior to the closing date of the solicitation." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2008) (quoting *MCI Telecommunications Corp. v. United States*, 978 F.2d 362, 365 (Fed. Cir. 1989). "[T]he opportunity to become a prospective bidder ends when the proposal period ends." *Digitalis Educ. Sols., Inc.*, 664 F.3d at 1385 (citation omitted). Additionally, the Federal Circuit has clarified that in addition to filing a timely protest, the protestor may only be considered a "prospective bidder" if it continues "to pursue its right in a diligent fashion." *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1350-51 (Fed. Cir. 2015).

[6] Standing also requires a protestor to show that it "was prejudiced by a significant error in the procurement process." *CliniComp Int'l, Inc.*, 904 F.3d at 1358. "Although the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *Id.* Just as a protestor must demonstrate that it is an interested party, so too must the protestor establish standing before the court can address the merits. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("In fact, because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").

that it has standing to bring this protest. According to the government ACEs has not

demonstrated that it is qualified to compete for this procurement and it therefore does not

have a direct economic interest in the subject procurement. Def.'s MJAR at 6-13. In

support of its standing argument, the government relies on the allegations in ACEs'

complaint, which the government argues are not sufficient to meet the minimum

requirements for award. In particular, the government argues that nowhere in its

complaint does ACEs allege that it has the network design capability described and

necessary to perform CLIN 006 or the cybersecurity background needed. In addition, the

government argues that the size of the contract to be awarded under the subject

Solicitation, which exceeds $300 million, is much greater than any contract ACEs has

ever received. Relying on uncontested data from the USASpending.gov, a webpage

which tracks contract awards, spending, and evaluations under those contracts, it appears

that within the last five years, ACEs has been awarded government contracts with a total

potential value of $20.1 million. Def.'s MJAR at Appx 10; Appx 12-116. ACEs' largest

government contract award was for a one-year contract in 2010 for $13.8 million. *Id.* at

Appx 11-12. ACEs' government contracts have mainly involved training and instruction,

customer service support, and other support services. Def.'s MJAR at Appx 13, 20, 27,

34, 41, 48, 55, 69, 76, 83. None of ACEs prior contracts were assigned NAICS code

541715.

ACEs does not dispute the government's factual assertions regarding standing but

argues that it is nonetheless a qualified bidder. First, ACEs argues that the government

did not challenge ACEs' qualifications before OHA and has thus conceded it is qualified.

Pl.'s Resp. at 3 (citing AR 3857). Second, ACEs contends that to the extent it does not

have in-house capabilities to meet the requirements of the Solicitation, ACEs can

accomplish certain requirements, including, cybersecurity requirements with off-the-shelf

products, Pl.'s MJAR at 40, and can meet any of the CLIN 006 requirements by hiring

subcontractors. Pl.'s Resp. at 4 (ECF No. 28). ACEs argues that with the off-the-shelf

products and subcontractors it can satisfy the capabilities identified by MDA, namely it

can assume of "all Research, Test and Evaluation, and Operation and Maintenance

Functions," including "in-progress tests, experiments, exercises, war-games and other

customer programs as well as upgrade and modernization tasks involving facility,

hardware, and software efforts." AR 1-2.

The Federal Circuit in *CliniComp Int'l, Inc.* held that to demonstrate standing a

prospective contractor must be able to "demonstrate an ability to perform specific

requirements that are set forth in the administrative record." 904 F.3d at 1360. In that

case involving a challenge to the government's decision to negotiate a sole source

contract, the Federal Circuit examined whether CliniComp would be capable of

performing the work in the challenged contract. After reviewing the complaint and

evidence presented, the Federal Circuit measured CliniComp's alleged qualifications

against the Determination and Findings which authorized the federal agency "to negotiate

a sole-source contract" with a particular company. *Id.* at 1356. The Federal Circuit

concluded that CliniComp's alleged qualifications were not sufficient to meet the

government's stated contract needs and thus CliniComp would not qualify for the

contract had it been open for competition. *Id.* at 1360. Specifically, in *CliniComp Int'l*

*Inc.*, the contract required outpatient services and the Circuit found that CliniComp had

not demonstrated its ability to perform outpatient services and thus by itself would not be

qualified. The Circuit also found that CliniComp could not satisfy the contract's

requirements by alleging that it could partner with another contractor. The Circuit

explained that vague allegations regarding the ability to hire out services that it could not

perform were not sufficient to prove that the protestor was qualified. *Id.* at 1360-61. For

all of these reasons, the Circuit agreed with the trial court that the protestor was not

qualified to perform the necessary work and thus affirmed the dismissal for lack of

standing. *Id*.

 Tested by the *CliniComp* standards, the court finds that ACEs has not shown that

it could satisfy the specific requirements in the Solicitation and that its suggestion that it

could hire subcontractors to perform work is insufficient to establish standing.

 Here, the Solicitation explicitly calls for the contractor to perform network design.

Specifically, the Solicitation states:

> The contractor shall re-design network architecture to support increased
> data transmission for CI/CAT. . . .
>
> The contractor shall design and implement a network engineering,
> management, and monitoring capability that encompasses all unclassified
> and classified networks within the ARC. . . .
>
> The contractor shall design, develop and implement network designs in
> support of HWIL, test lab emulation and cybersecurity. These network
> design activities will include expansion and/or changes to existing network
> designs.
>
> These network design activities will include expansion and/or changes to
> existing network designs to . . . [i]ncorporate new BMDS systems such as
> LRDR and HDR into the complex BMDS representation at the ARC.

AR 3367. Indeed, network design was subfactor 4 of the technical evaluation criteria. AR 3739.

ACEs' complaint provides no information regarding its ability to perform network design and ACEs had not provided any additional evidence to contradict the government's assertion that ACEs is not capable of creating new network designs. Rather, ACEs originally argued that it would be able to "utilize commercial off-the-shelf products" to meet the network design requirements. *See* Pl.'s MJAR at 40. ACEs clarified during oral argument that its statement regarding off-the-shelf products applied to cybersecurity requirements. Oral Argument 14:37:50-14:38:08. ACEs now argues that it would partner with subcontractors to meet the work requirements set forth in CLIN 006.

Both arguments fail. First, to the extent ACEs still believes it could rely on off-the-shelf products for network design the argument is unsupported. The Solicitation clearly requires the contractor to "*design*, develop and implement network designs" which will respond to expansions of the "new BMDS systems." AR 3367. These are requirements for "new processes and tools to respond to changes . . . to include network design and expansion." *See* AR 3880. Therefore, off-the-shelf products cannot satisfy requirements for new products unique to the ARC.

Second, ACEs claim that it could partner with subcontractors to meet CLIN 006 requirements, without more details, is not sufficient to establish that ACEs is qualified. ACEs argues that it "routinely works with numerous other companies and could easily

form a qualified team." Pl.'s Resp. at 4. ACEs does not identify any such partner, nor does it provide any details as to how this could be done. As noted above, the Federal Circuit rejected a nearly identical argument in *CliniComp Int'l Inc.* 904 F.3d at 1360. The Federal Circuit found that argument "unpersuasive" because the protestor had "not supplied any details regarding how, or with whom, it would subcontract to perform what is required." *Id.* The Federal Circuit stated that the protestor's "vague, cursory references to using subcontractors to perform the work it is unable to do are insufficient" to demonstrate standing. *Id.* at 1360-61. Here, ACEs' statement that it can and routinely does form partnerships is just as vague as the protestor's statement that it could subcontract work in *CliniComp, Int'l Inc.* ACEs provides no details regarding how or with whom it would work to create a qualified team. Therefore, the court concludes that where a solicitation contains extensive work in network design and the protestor concedes it does not have the necessary qualifications and provides no facts to support how it will complete that work has failed to demonstrate by a preponderance of the evidence that it is a qualified bidder with standing.

In addition to the foregoing issues with ACEs standing, the government also argues that ACEs has not "demonstrated that it can perform a contract as large as the ARC contract." Def.'s MJAR at 8. This challenge to ACEs' standing is again similar to the standing challenge the protestor faced in *CliniComp Int'l Inc.* In that case, the protestor "only had experience provid[ing] services at 100 facilities" and the contract "would require comprehensive services . . . at 1,600 VA healthcare cites." 904 F.3d at 1359. The Federal Circuit found the protestor's inexperience with contracts the size of the

one at issue was another reason why the protestor was not qualified to compete. *Id* at 1360.

Here, the ARC contract is expected to reach $308 million in funding over the course of five years, three one-year option periods, and one half-year option period. AR 3743. The contract is estimated to run from $38 to $42 million yearly. AR 204. ACEs does not dispute the information from USASpending.gov, which shows that ACEs has only been awarded contracts "with a total potential value of $20.1 million" and that its largest contract has had a $13.8 million value. Def.'s MJAR at 9. In response, ACEs argues, again, that it can handle a contract of the size at issue by partnering with other organizations. As discussed above, ACEs' argument, without more factual support, fails. ACEs has not shown that it has the financial resources to perform the ARC contract. Therefore, for this reason as well, ACEs does not have standing to bring its claims.[7]

---

[7] The government further argues that ACEs is not qualified to compete because ACEs failed to submit necessary information and obtain necessary information to compete for the contract. Def.'s MJAR at 9. In particular, the government argues that by failing to meet the October 22, 2018 deadline to confirm submitting proposals, the October 25, 2018 deadline to submit a proposal, and the May 17, 2018 deadline to submit the OCI review forms, ACEs failed to show it was qualified to compete for the contract. AR 2563 (submission deadline), 2653 (deadline to confirm submitting proposal); AR 1343 (OCI review form request). The government argues that ACEs failed to obtain necessary information by not accessing information necessary to submit a bid until October 2, 2018 and not participating in industry day tours. Def.'s MJAR at Appx2 ¶ 6. The government cites no legal authority in making these arguments. The court does not find the government's arguments persuasive. To extent that ACEs intended to protest the NAICS code designation and compete if the contract were resolicited, ACEs alleges it would submit the required documents. Additionally, attendance at industry day was not required to compete in the contract, AR 29, and the court cannot find that accessing necessary information to compete for the contract later than other offerors made ACEs unqualified to compete. Similarly, the government conceded in oral argument that submission of OCI information was not a requirement to compete for the contract. Oral Arg. 14:01:00-14:03:00.

For all of these reasons, the court finds that ACEs has failed to establish that it is qualified for an award of the subject contract and has thus failed to establish an economic harm sufficient to establish standing.

## IV. MERITS DISCUSSION

Although for the above-stated reasons the court finds that ACEs has failed to establish standing, in the interest of judicial economy, the court will address the merits of ACEs' claims.[8]

### A. OHA's Decision Is Supported

ACEs argues that OHA's decision to affirm MDA's selection of NAICS code 541715 was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.[9] First, ACEs argues that OHA abused its discretion by violating its procedures when it considered a version of the Solicitation amended after OHA's close of record date. ACEs argues that OHA's consideration of amendments made after the record was closed violates 13 C.F.R. § 134.226 which states that the "record will constitute the exclusive

---

[8] Assuming as discussed above that ACEs does have standing, this court does have jurisdiction over ACEs' appeal of the OHA decision and challenge to the terms of the Solicitation under 28 U.S.C. § 1491(b)(1). *See Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015). The standards of review under Section 1491(b)(1) are well settled. The court must determine whether the agency decision "lacked a rational basis" or "involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). With regard to alleged errors of law, a protestor must demonstrate "a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333.

[9] While ACEs attempts to challenge MDA's NAICS code decision separate from the OHA decision, the challenge has no merit. *See* Pl.'s MJAR at 21. OHA has the "exclusive jurisdiction to review the [CO's] determination of the appropriate NAICS code designation." *Ceres Envtl. Servs., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002) (citing 13 C.F.R. § 121.1102)). Because OHA is the final decision maker, the NAICS code challenge is limited to OHA's appeal.

basis for a decision," and the decision should therefore be set aside. Second, ACEs argues that OHA acted irrationally when affirming MDA's NAICS code designation. ACEs argues that NAICS code 541513 ("Computer Facilities Management Services") with a small-business size standard of $27.5 million was a more appropriate NAICS code for the subject Solicitation. For the reasons discussed below, both of ACEs' arguments are without merit.

### 1.  OHA's Consideration of October Amendments to the Solicitation

ACEs claims that OHA "abused its discretion" by violating its regulatory procedures when OHA considered the October 16, 2018 Solicitation amendments. Pl.'s MJAR at 36-37. To support this argument, ACEs cites two regulations. First, ACEs cites 13 C.F.R. § 134.226 which states the "record will constitute the exclusive basis for a decision." Second, ACEs cites 13 C.F.R. § 134.225 which indicates that OHA "will set the date upon which the pre-decisional record of the case will be closed, and after which no additional evidence or argument will be accepted." ACEs argues that in conjunction, these two regulations prohibit OHA from considering amendments to the Solicitation made after OHA sets the record to be closed.

The government responds that OHA did not violate the regulations, and that even if OHA did violate the regulations, the violation amounted to a harmless error. First, the government argues that ACEs misconstrues the regulations and that in NAICS appeals, the record includes the Solicitation and all its amendments. *See* Def.'s MJAR at 30-31. The government explains that the regulations ACEs relies on are contained in Subpart B, while OHA appeals are "[t]he rules of practice set out in . . . Subpart C." 13 C.F.R.

37

§ 134.301. Pursuant to Subpart C, Subpart B may apply "[e]xcept where inconsistent with this subpart[.]" 13 C.F.R. § 134.313. Further, Subpart C indicates that "the contents of the record also include the *case file* or solicitation submitted to OHA in accordance with § 134.306." 13 C.F.R. § 134.315 (emphasis added). 13 C.F.R. § 134.306 requires the CO to send OHA "an electronic link to or a paper copy of both the original solicitation relating to that procurement and all amendments." The case file itself is defined to include "the solicitation and amendments." Therefore, the government argues that where OHA reviews a NAICS code appeal, the record also includes amendments to the solicitation. Second, the government argues that even if OHA violated its own procedures, the violation amounted to a harmless error because the relevant amendments to the Solicitation were only stylistic. As discussed above, there were only seven changes to the Solicitation:

1.  "Urgent, Non-Test, Network down reporting: 4 hours" was removed from Section 4.3.1(e)(2).

2.  Section 5.2, subsections (a)-(d), of the original PWS were replaced with Section 5.2, subsections (a)-(g), in the revised (Rev 01) PWS.

3.  Section 5.2, subsections (e), (f), and (g), of the original PWS were moved to Section 5.0, subsections (a), (b), and (c), of the Rev 01 PWS.

4.  In Section 5.3(d)(6), "1000 business days" was changed to "45 business days."

5.  In Section 5.3(f), the citation "sections 3a-e" was changed to "sections 5.3(c)1-5."

6.  In Sections 9 and 11, a parenthesis was added in the header to reflect the CLIN numbers.

7. Section 12.0(c) and the "Staffing Requirements" table were updated to number the key personnel for clarity.

The court agrees with the government's arguments. First, the court finds that because Subpart C and not Subpart B governs the dispute, OHA did not violate its own procedures by considering the October Solicitation amendments. Second, the court agrees with the government that even if there were an error, it would be harmless. *See Trans Dig. Techs., LLC v. United States*, 138 Fed. Cl. 34, 41 (2018) ("We also apply the rule of harmless error, requiring protestors to show that they were in fact harmed by agency actions alleged to be improper."). At oral argument, when asked about how ACEs was harmed, ACEs argued that the procedures are mandatory and any failure to follow the regulations is grounds for reversal of OHA's decision. Oral Arg. 14:31:10-14:31:50. This is not the case. Where the government demonstrates that the relevant amendments to the Solicitation were stylistic and not substantive and ACEs does not identify any alleged harm from the inclusion of the last Solicitation amendment, the court finds that even if there was a procedural error, that error was harmless and does not provide a basis for setting aside OHA's decision.

## 2. OHA's Affirmance of NAICS Code 541715

ACEs claims that OHA's decision finding no clear error in MDA's selection of NAICS code 541715 for this Solicitation was arbitrary, capricious, and an abuse of discretion. Pl.'s Resp. at 14-20. First, ACEs argues that OHA's conclusion that the description of research and development under Footnote 11(d) was applicable to work described in the Solicitation was arbitrary, capricious, and an abuse of discretion because

OHA's conclusion was not supported by the record. Second, ACEs argues that because Footnote 11(d) is inapplicable, this Solicitation does not otherwise qualify as research and development under NAICS code 541715. The court begins by reviewing OHA's decision.

ACEs argued before OHA that NAICS code 541715 is inappropriate for this Solicitation because "this is not a research and development procurement" and urged "OHA to conclude NAICS code 541513, Computer Facilities Management Services, with a $27.5 million annual receipts size standard, is the appropriate NAICS code" for the Solicitation. AR 3885. ACEs' principal argument was that "contracts to support or assist a research organization cannot be automatically deemed to be research and development procurements." *Id.* In particular, ACEs argued that CLIN 006, which "is the single largest CLIN, making up 41% of the Full Time Equivalents (FTE) for the instant procurement," includes required tasks which "are not research and development, but design and implementation of hardware and software solutions that support MDA." *Id.*

OHA concluded that "an RFP which requires evaluations and simulations involving missiles and similar devices, as well as a thorough knowledge of these technologies, may be designated under NAICS 541715, under the Guided Missiles and Space Vehicles exception." AR 3890. (citing *NAICS Appeal of DCS Corp.*, SBA No. NAICS-5703, 2016 WL 270949, at *4 (Jan. 6, 2016)). Regarding this procurement, OHA explained that "this RFP explicitly requires services involving evaluations and simulation of missiles, requiring a thorough knowledge of missiles, and thus fits into the description of the NAICS exception in Footnote 11(d)." AR 3891.

Specifically, OHA concluded that CLIN 006 on network design, call for services that qualify as research and development under Footnote 11(d). AR 3891. OHA stated that the "contractor is required to develop new tools and processes to respond to changes required by the results of testing" and that the "contractor will participate in the system design activities to implement improvements to CI/CAT, asset management and all of MDA's data flow." *Id.* OHA specifically concluded that under CLIN 006, the "contractor's work will include original investigation, or research, to obtain necessary knowledge to develop the AoA for hardware and software solutions necessary to support the CI/CAT." *Id.* OHA stated that CLIN 006 "represents the largest portion of this contract, with 41% of FTEs to be worked" and "includes research and development of the software which will be an integral part of the essential simulations to support the BMDS." *Id.* Therefore, OHA concluded, "the CO was correct in characterizing this CLIN as research and development." *Id.* OHA added that because ACEs had not shown that "NAICS code 541715 is clearly erroneous for this RFP, it is unnecessary to consider the NAICS code [ACEs] advocates." AR 3892.

ACEs argues that OHA failed to cite any evidence for the conclusion that "this RFP explicitly requires services involving evaluations and simulations of missiles, requiring a thorough knowledge of missiles, and thus fits into the description of NAICS exception in Footnote 11(d)." Pl.'s MJAR at 38 (citing AR 3891). In this connection, ACEs argues that OHA mischaracterized the Solicitation's statement that a "thorough knowledge of the BMDS and the interdependency of these labs is required to manage the assets" to mean a thorough knowledge of missiles is required. Pl.'s MJAR at 38. Instead,

ACEs argues that the prior statement in the Solicitation merely requires understanding "how MDA is organized and how it manages the BMDS." *Id.* Similarly, ACEs argues that because the terms "evaluations and simulations of missiles" and "thorough knowledge of missiles" appears nowhere in the Solicitation, OHA's application of Footnote 11(d) was arbitrary and capricious. *Id.* at 38-39. ACEs argues that if Footnote 11(d) is read broadly enough to cover the services in this Solicitation, "any services performed in the ARC (*e.g.*, construction, maintenance, security) could 'involve' evaluations and simulations that require a 'thorough knowledge of complete missiles and spacecraft.'" Pl.'s Resp. at 15.

The government argues first that ACEs' challenge to OHA's decision regarding the application of Footnote 11(d) is contradicted by the record and thus without merit. Contrary to ACEs' claims, the government points to the Solicitation's requirement "for a "thorough knowledge of the BMDS and the interdependency of these labs" as plain support for OHA's decision. AR 3891.

The court agrees with the government that it was not irrational for OHA to treat the Solicitation as requiring an awardee to have both a "thorough knowledge of the BMDS" and a thorough knowledge of "the interdependency of these labs." *See* Def.'s MJAR at 25.[10]  For this reason, OHA's reliance on Footnote 11(d) was not misplaced on the first ground asserted by ACEs.

---

[10] ACEs' reliance on *Millenium Eng'g & Integration Co.*, SBA No NAICS-5309, 2011 WL 6183624, at *11 (Dec. 12, 2011) for the proposition that Footnote 11(d) does not apply even when "knowledge of missiles and spacecraft is the heart of the RFP" is misplaced. In *Millenium*, OHA affirmed the NAICS code designation for engineering services because while Footnote

Second, the government argues that while the Solicitation does not use the exact

language in Footnote 11(d) regarding "evaluations and simulations of missiles" and

"thorough knowledge of missiles," OHA rationally concluded that under CLIN 006 as

described in the PWS, "[t]he contractor is required to develop new tools and processes to

respond to changes required by the results of the test[,] . . . participate in the system

design activities[,] . . . [and] obtain necessary knowledge to develop the AoA for

hardware and software solutions necessary to support the CI/CAT," AR 3891, and thus

"contractor's work will include original investigation, or research, to obtain necessary

knowledge to develop the AoA for hardware and software solutions necessary to support

the CI/CAT." *Id.*

Again, the court agrees that OHA rationally determined that the tasks identified

above meet the criteria for Footnote 11(d). The Solicitation called for the contractor to

respond to results of tests, develop tools, participate in system design, and obtain

knowledge for hardware and software and because completion of those services will

require a thorough knowledge of a missile defense system, it was not irrational for OHA

to conclude that those services fall under Footnote 11(d)'s definition of research and

development.

Moreover, the court finds that the OHA decision, contrary to ACEs' contentions,

is consistent with past OHA decisions applying Footnote 11(d). *See NAICS Appeal of*

*DCS Corp.*, NAICS-5703, 2016 WL 270949, at *4 (Jan. 6, 2016) (affirming the

---

11(d) could apply, the agency's view of the services as engineering services rather than research
and development was not clear error. *Millenium*, SBA No. NAICS-5309, at *11.

application of Footnote 11(d) to work "assessing aircraft safety and performance in connection with the loading, carriage, and release of aircraft"); *Inkling Media Co., LLC*, NAICS-4850, 2007 WL 1537649, at *5 (May 16, 2007) (affirming the application of Footnote 11(d) where the purpose of the RFP was to obtain services "to coordinate all technology base development to maximize benefits for strategic and theater missile defense").

In view of the foregoing, the court finds that ACEs' concern that OHA applied Footnote 11(d) too broadly so as to include "any services performed in the ARC (*e.g.*, construction, maintenance, security)" is without merit. *See* Pl.'s Resp. at 15. OHA did not conclude that all the work in the contract was research and development; OHA identified the work in certain CLINs that was research and development. Because CLIN 006 accounted for 41% of the work and no other one NAICS code covered more than 41% of the work, it was not irrational for OHA to affirm the NAICS code 541715 designation. *See* FAR § 19.102(d) (requiring the contractor to assign the NAICS code "accounting for the greatest percentage of the contract price").[11]

---

[11] To that extent ACEs argues that even if CLIN 006 calls for research and development, NAICS code 541715 is inappropriate because CLIN 006 does not represent the majority of work under the Solicitation, its argument also fails. *See* Pl.'s MJAR at 34. First, this argument has been waived because it was not raised before OHA. *See Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1261 (Fed. Cir. 2015) (dismissing the protestor's claim where the protestor "fail[ed] to present this argument in the pending OHA appeal"). Indeed, ACEs made the opposite argument by relying on CLIN 006 exclusively in its arguments to OHA that NAICS code 541513 covered the majority of the contract work. AR 3885. Second, ACEs provides no evidence to show that any other single NAICS code covers more than the 41% of the work in CLIN 006. Thus, OHA's conclusion regarding the NAICS code covering the largest amount of the contract work was CLIN006 is supported.

**B. The Past Performance Evaluation Criteria Are In Accordance With the Law and ACEs Was Not Prejudiced by the CO's Past Performance Evaluation Approach**

ACEs argues that MDA's change of past performance evaluation criteria from the March DRFP which included five rating categories to the current Solicitation which only gives an acceptable or unacceptable rating was not in accordance with the law for two reasons. First, ACEs claims that the Solicitation's acceptable/unacceptable eligibility scheme fails to make a comparative analysis as required by 48 C.F.R. § 15.305(a)(2)(i) which states the "comparative assessment of past performance information is separate from the responsibility determination." Second, ACEs argues that assigning offerors with no relevant past performance an "acceptable" rating for past performance is not in accordance with 41 U.S.C. § 1126(b) and 48 C.F.R. § 15.305(a)(2)(iv) which both state "if there is no information on past performance of an offeror or the information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on the factor of past performance."[12] ACEs argues that it is prejudiced by the past performance evaluation terms because the terms unlawfully prevent ACEs from getting credit from its allegedly excellent past performance. For the reasons that follow, both arguments are meritless.

---

[12] 48 C.F.R. § 15.305(a)(2)(iv) states "In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance."

ACEs' argument that 48 C.F.R. § 15.305(a)(2)(i) requires comparative analysis that goes beyond a pass/fail scheme is unsupported.[13] ACEs argues that "under the FAR, past performance is a mandatory evaluation factor" and that an acceptable/unacceptable evaluation does not satisfy the regulations requirement for a "comparative" analysis. Pl.'s Resp. at 8. In making this argument, ACEs asserts that Section 15.305(a)(2)(i) requires MDA to "conduct a comparative analysis of performance histories beyond a threshold inquiry of eligibility." Pl.'s MJAR at 25.

The government contends, however, that this Solicitation satisfies Section 15.305(a)(2)(i) by comparing the past performance of offerors to the requirements in the Solicitation to arrive at the acceptable or unacceptable rating and that ranking based on past performance is not required.

In full, Section 15.305(a)(2)(i) states:

> Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information is separate from the responsibility determination required under subpart 9.1.

---

[13] To the extent that ACEs argues that 48 C.F.R. § 15.305(a)(2)(i) requires comparing the offerors' past performance against one another, this argument is without support. First, ACEs states in its response that it "made no such argument." Pl.'s Resp. at 8. But even if it did, that argument would fail. This court has previously interpreted Section 15.305(a)(2)(i) to require a comparison of an offeror's past performance to the contract requirements. *United Concordia Cos., Inc. v. United States*, 99 Fed. Cl. 34, 45 (2011) ("The term 'comparative' is used in this section in the sense that the offerors' past performance is compared with the requirements of the contract."). Indeed, "the comparative analysis sought by plaintiff would require an 'apples-to-oranges' comparison because the offeror's past efforts arise out of different contract." *See id.*

The government thus argues that when read in its entirety, Section 15.305(a)(2)(i) makes clear that "this comparative assessment" refers to the earlier stated requirement to evaluate whether the offeror could perform the contract successfully by looking to the "currency, relevance, source, context, and general trend" of the offeror's past performance. The sentence also requires that this assessment be different than the responsibility determination.  According to the government, this Solicitation does exactly that. AR 3259-60 (evaluating the offerors' past performance on recency, relevancy, and quality and clarifying that the past performance evaluation is different than the responsibility determination). The government argues that this court has defined "comparative" to mean that the "offerors' past performance is compared to the requirements of the contract." *United Concordia Cos., Inc. v. United States*, 99 Fed. Cl. 34, 45 (2011).

The court agrees with the government's reading of 48 C.F.R. § 15.305(a)(2). In addition, the court finds that ACEs' reliance on *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502 (2009) is misplaced. *Al Ghanim* involved 48 C.F.R. § 15.305(a)(3)'s technical evaluation requirements not 48 C.F.R. § 15.305(a)(2)'s past performance evaluation requirements. *See id.* at 519.[14] The government's reading of 48 C.F.R. § 15.305(a)(2)(i) is supported and ACEs has not

---

[14] 48 C.F.R. § 15.305(a)(3) provides "Technical Evaluation. When tradeoffs are performed (see 15.101-1), the source selection records shall include – (i) An assessment of each offeror's ability to accomplish the technical requirements; and (ii) A summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors." This references 48 C.F.R. § 15.101-1 which describes how a tradeoff process functions.

shown that the agency violated the provision by having only acceptable or unacceptable as the standards for evaluating past performance.

Regarding ACEs' second argument that the Solicitation's past performance evaluation criteria violate 41 U.S.C. § 1126(b) and 48 C.F.R. § 13.305(a)(2)(iv), the court finds as follows.[15] ACEs argues that the Solicitation effectively treats "any offeror with no past performance history . . . *favorably* by being rated as 'Acceptable' – the highest possible rating." Pl.'s MJAR at 25. ACEs asserts that at best those contractors lacking relevant past performance experience should receive only a "neutral" rating. *See* Pl.'s MJAR at 5 n.1, 25. As ACEs explained at oral argument, a lawful Solicitation would provide a "neutral" but not "acceptable" rating to those with no past performance. ACEs conceded, however, that those with no past performance, under either formulation should be allowed to compete. Oral Arg. 15:10:40-15:11:30.

The government argues that because under either formulation those without relevant past performance would be eligible to compete for the award, ACEs cannot show any prejudice from MDA's "acceptable" and "unacceptable" rating system. Def.'s MJAR at 40.

The court agrees with the government that because under ACEs' proposed formulation contractors without relevant past experience would be eligible to compete, ACEs has not shown how it would benefit from a change in the Solicitation's past performance approach to include a neutral rating. It is for this reason that ACEs has not

---

[15] The parties' arguments for both 41 U.S.C. § 1126(b) and 48 C.F.R. § 15.305(a)(2)(iv) are one and the same.

established prejudice. To establish prejudice, ACEs would have to show that a higher

past performance rating would impact the agency's tradeoff evaluation so that offerors

with higher past performance ratings would be given a better opportunity for award than

those with no relevant past performance. In this Solicitation, however, MDA elected not

to include past performance in the tradeoff evaluation and ACEs has not challenged that

decision.

It is clear from its complaint that ACEs has not alleged that MDA unlawfully

failed to include past performance in its tradeoff analysis. The Solicitation explicitly

indicates, as noted above, that the "selection decision will document tradeoffs between

Factors 4, 5, and 6 in the competitive range [for those offerors receiving] receiving an

acceptable rating for Factors 1-3." AR 3226. Past performance was Factor 3 and therefore

not part of the tradeoff analysis. *Id.* ACEs' amended complaint makes no challenge to the

aforementioned language. Instead, ACEs only challenges the past performance evaluation

criteria to the extent that assigning a rating of "Acceptable" to "any offeror without a

record of relevant past performance or for whom information on past performance is not

available" as opposed to "neutral" violates 41 U.S.C. § 1126(b) and 48 C.F.R.

§ 15.305(a)(2)(iv). Amend. Compl. ¶¶ 31-35. A challenge to the past performance criteria

is not the same as a challenge to the tradeoff analysis criteria.

Having failed to challenge MDA's decision not to include past performance in the

tradeoff evaluation, ACEs cannot demonstrate that there would be any difference to its

award potential under the current Solicitation's formulation of Factor 3 or under the

approach it advocates. In such circumstance, ACEs failed to demonstrate prejudice.

49

## V.    CONCLUSION

In sum, ACEs has not met its burden to show that it has standing to pursue this pre-award protest. Furthermore, even if it could establish standing, ACEs has failed to meet its burden to demonstrate that OHA was arbitrary, capricious, abused its discretion, or was not in accordance with the law when it affirmed the CO's designation of NAICS code 541715 for this Solicitation. In addition, ACEs has not established that the CO's past performance evaluation approach violated 48 C.F.R. § 15.305(a)(2)(i), or that the approach prejudiced ACEs under 41 U.S.C. § 1126(b) or 48 C.F.R. § 15.305(a)(2)(iv) where ACEs had not challenged the CO's tradeoff criteria. For the forgoing reasons, the court **GRANTS** the government's cross-motion for judgment on the administrative record and **DENIES** ACEs' motion for judgment on the administrative record together with its motion for injunctive relief. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge